******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## BAY ADVANCE, LLC *v.* BARRY STUART HALAJIAN
## (AC 47341)

Cradle, C. J., and Moll and Palmer, Js.

*Syllabus*

The defendant appealed from the trial court's judgment granting the plaintiff's motion to enforce a settlement agreement and awarding the plaintiff $50,000. The defendant claimed that the court, in granting the motion, improperly determined that the parties had reached an enforceable settlement agreement. *Held*:

The appeal was not moot despite full satisfaction of the judgment, as this court could afford the defendant practical relief by ordering restitution.

The trial court reasonably determined that there was no dispute that the parties had reached an enforceable settlement agreement, as certain emails exchanged between the parties' counsel reflected that the parties had agreed to a settlement pursuant to the terms set forth in a draft settlement agreement, and, during a hearing held pursuant to *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.* (225 Conn. 804), the defendant's counsel acknowledged that the parties had entered into a settlement agreement as set forth in the draft agreement.

Argued September 11—officially released November 4, 2025

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant filed a counterclaim; thereafter, the court, *Hon. John F. Kavanewsky, Jr.*, judge trial referee, granted the plaintiff's motion to enforce a settlement agreement and rendered judgment thereon, from which the defendant appealed to this court. *Affirmed.*

*Barry Stuart Halajian*, self-represented, filed a brief as the appellant (defendant).

*Jared M. Alfin*, for the appellee (plaintiff).

*Opinion*

MOLL, J. The self-represented defendant, Barry Stuart Halajian, doing business as Industrial Electric Company, appeals from the judgment of the trial court granting a motion to enforce a settlement agreement filed

by the plaintiff, Bay Advance, LLC. On appeal, the defendant claims that the court improperly determined that the parties had entered into an enforceable settlement agreement. We affirm the judgment of the trial court.

The following procedural history is relevant to our resolution of this appeal. On June 14, 2023, the plaintiff commenced the present action against the defendant. In its one count complaint asserting a breach of contract claim, the plaintiff alleged that the defendant had failed to make required payments to it pursuant to a commercial contract that the parties had executed concerning future business receivables.[1] On July 20, 2023, the defendant, through counsel, filed an answer, a special defense alleging unconscionability, and a one count counterclaim alleging a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. On July 21, 2023, the plaintiff filed a reply denying the defendant's special defense and an answer denying the allegations of the counterclaim.

On August 29, 2023, the plaintiff filed a motion to enforce an alleged settlement agreement that had been reached between the parties (motion to enforce). On September 6, 2023, the defendant filed an objection. On December 15, 2023, the plaintiff filed a reply memorandum.

On December 18, 2023, following an *Audubon* hearing,[2] the trial court, *Hon. John F. Kavanewsky, Jr.,*

---

[1] In conjunction with the present action, the plaintiff's attorney issued a writ for an ex parte prejudgment remedy to attach $85,940 of the defendant's assets on the basis that the parties' commercial contract contains a prejudgment remedy waiver clause. See General Statutes § 52-278f. The return of service filed with the trial court reflects that a state marshal garnished $85,940 of the defendant's assets in the hands or possession of JPMorgan Chase Bank, N.A.

[2] "An *Audubon* hearing is conducted to decide whether the terms of a settlement agreement are sufficiently clear and unambiguous so as to be enforceable as a matter of law." (Internal quotation marks omitted.) *307 White Street Realty, LLC* v. *Beaver Brook Group, LLC*, 216 Conn. App. 750, 757 n.5, 286 A.3d 467 (2022); see also *Audubon Parking Associates Ltd.*

judge trial referee, granted the motion to enforce and rendered judgment in favor of the plaintiff against the defendant in the amount of $50,000, the settlement amount sought by the plaintiff. On January 4, 2024, the defendant filed a motion to reargue, to which the plaintiff filed an objection on January 5, 2024. On January 19, 2024, the court denied the defendant's motion to reargue. This appeal followed. Additional procedural history will be set forth as necessary.

I

Before analyzing the merits of this appeal, we preliminarily address the plaintiff's claim that this appeal is moot because, during a period when this appeal had been dismissed and not yet restored to the docket, the judgment was satisfied in full. We conclude that this appeal is not moot.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . The fundamental principles underpinning the mootness doctrine are well settled. We begin with the four part test for justiciability . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by the judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . .

"[I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of

*Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811–12, 626 A.2d 729 (1993).

actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *State* v. *Marsala*, 204 Conn. App. 571, 575–76, 254 A.3d 358, cert. denied, 336 Conn. 951, 251 A.3d 617 (2021).

The following additional procedural history is relevant to our resolution of the plaintiff's mootness claim. On February 8, 2024, the defendant, representing himself, filed this appeal. On March 12, 2024, this appeal was dismissed as a result of the defendant's failure to file the preliminary papers required pursuant to Practice Book § 63-4. That same day, the plaintiff filed with the trial court (1) a notice that this appeal had been dismissed and (2) an application for a financial institution execution in the amount of $50,105—comprising the $50,000 amount that the trial court awarded the plaintiff plus a $105 application fee—directed to the defendant. The defendant did not file a response to the application. On April 16, 2024, the financial institution execution was issued.

On April 19, 2024, the defendant filed with this court a motion for reconsideration of the March 12, 2024 dismissal order, requesting that this court restore this appeal to the docket and grant him an extension of time to file the preliminary papers required pursuant to Practice Book § 63-4. On April 24 and 25, 2024, the defendant filed several documents in an apparent effort to comply with § 63-4. On May 6, 2024, this court issued an order providing in relevant part that the defendant's motion for reconsideration was "[g]ranted, provided that the [defendant] files a notice of appeal transcript order form with section two filled out by the official court reporter with an estimated date of delivery or a

certification of completion, on or before May 16, 2024."[3] On May 16, 2024, the defendant filed an appeal transcript order form in compliance with this court's May 6, 2024 order. That same day, this court issued an order restoring this appeal to the docket.

Meanwhile, on May 15, 2024, one day prior to the issuance of the May 16, 2024 order restoring this appeal to the docket, the plaintiff filed with the trial court a return reflecting that the financial institution execution had been satisfied in full. Specifically, the return provided that, on May 12, 2024, a state marshal had remitted to the plaintiff a check in the amount of $50,105.

On May 23, 2024, the plaintiff filed with this court a motion to dismiss this appeal as (1) moot on the basis of the fully satisfied financial institution execution and (2) frivolous. On June 7, 2024, the defendant filed an opposition. On September 4, 2024, this court denied the plaintiff's motion to dismiss this appeal without prejudice to the parties arguing the mootness issue in their appellate briefs.

In its appellate brief, the plaintiff asserts that this appeal is moot because there is no practical relief that we could afford the defendant following the full satisfaction of the financial institution execution.[4] We disagree.

"Our case law . . . indicates that the filing of a satisfaction of judgment does not render appeals moot because of the possibility of restitution or reimbursement." *Wells Fargo Bank, NA* v. *Cornelius*, 131 Conn. App. 216, 220, 26 A.3d 700, cert. denied, 302 Conn. 946, 30 A.3d 1 (2011); see also *Preisner* v. *Aetna Casualty & Surety Co.*, 203 Conn. 407, 414–15, 525 A.2d 83 (1987)

---

[3] On April 25, 2024, the defendant filed an incomplete appeal transcript order form.

[4] The defendant did not address the mootness issue in his principal appellate brief, and he neither filed a reply brief nor appeared for oral argument.

("[i]f a judgment has been satisfied before it is reversed . . . the law raises an obligation in the party to the record, who has received the benefit of the erroneous judgment, to make restitution to the other party for what he has lost" (internal quotation marks omitted)); *Long Manor Owners' Assn., Inc.* v. *Alungbe*, 218 Conn. App. 415, 419–20 n.5, 292 A.3d 85 (assuming arguendo that judgment had been satisfied, this court concluded that appeal was not moot because this court, as relief, could order restitution), cert. denied, 348 Conn. 909, 303 A.3d 10 (2023); *Lynn* v. *Bosco*, 182 Conn. App. 200, 213 n.15, 189 A.3d 601 (2018) (concluding that appeal was not moot despite claimed satisfaction of judgment when this court, as relief, could order restitution). In the present case, were we to agree with the defendant on the merits of this appeal and reverse the court's judgment granting the motion to enforce, thereby vacating its award of $50,000 to the plaintiff, restitution would be a viable remedy. Accordingly, we conclude that this appeal has not been rendered moot as a result of the return of the fully satisfied financial institution execution.[5]

## II

We now turn to the merits of this appeal. The defendant claims that the trial court, in granting the motion to enforce, improperly determined that the parties reached an enforceable settlement agreement. We disagree.

We begin by setting forth the following applicable legal principles and standard of review. "A trial court

[5] In support of its mootness claim, the plaintiff argues that there was no appellate stay in effect either when the financial institution execution was issued or when it was returned fully satisfied. Whether the plaintiff properly executed on the judgment is not at issue in this appeal; rather, the relevant question is whether the ensuing satisfaction of the judgment has rendered this appeal moot, which we answer in the negative.

has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous. . . . Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit. . . . Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes. When parties agree to settle a case, they are effectively contracting for the right to avoid a trial. . . . Nevertheless, the right to enforce summarily a settlement agreement is not unbounded. The key element with regard to the settlement agreement in [*Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 812, 626 A.2d 729 (1993) (*Audubon*)] . . . [was] that there [was] no factual dispute as to the terms of the accord. Generally, [a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law [only] when the terms of the agreement are clear and unambiguous . . . and when the parties do not dispute the terms of the agreement. . . . The rule of *Audubon* effects a delicate balance between concerns of judicial economy on the one hand and a party's constitutional rights to a jury and to a trial on the other hand. . . . To use the *Audubon* power outside of its proper context is to deny a party these fundamental rights and would work a manifest injustice. . . .

"A settlement agreement is a contract among the parties. . . . In order to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties . . . . The mutual understanding must manifest itself by a mutual assent between the parties. . . . In other words, [i]n order for an enforceable contract to exist, the court must find that the parties' minds had truly met.

. . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make. . . . Meeting of the minds is defined as mutual agreement and assent of two parties to contract to substance and terms. It is an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation. . . . This definition refers to fundamental misunderstandings between the parties as to what are the essential elements or subjects of the contract. It refers to the terms of the contract, not to the power of one party to execute a contract as the agent of another. . . .

"A contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation. The law does not . . . regard an arrangement as completed which the parties regard as incomplete. . . . In construing the agreement . . . the decisive question is the intent of the parties as expressed. . . . The intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish. . . . Furthermore, [p]arties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated. . . .

"[When] the general terms on which the parties indisputably had agreed . . . included all the terms that were essential to an enforceable agreement . . . [u]nder the modern law of contract . . . the parties . . . may reach a binding agreement even if some of the terms of that agreement are still indefinite. . . . The test of disputation . . . must be applied to the parties at the time they entered into the alleged settlement. To hold otherwise would prevent any motion to enforce a settlement from ever being granted. . . .

"When a party challenges the trial court's legal conclusion that the agreement was summarily enforceable, we must determine whether that conclusion is legally and logically correct and whether [it finds] support in the facts set out in the memorandum of decision . . . . In addition, to the extent that the [party's] claim implicates the court's factual findings, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *Worth* v. *Picard*, 233 Conn. App. 38, 47–50, 338 A.3d 1195 (2025).

The following additional procedural history is relevant to our resolution of the defendant's claim. In the motion to enforce, the plaintiff represented that (1) on or about August 18, 2023, the defendant's trial counsel contacted the plaintiff's counsel to convey a settlement offer pursuant to which (a) the defendant would pay the plaintiff $50,000, (b) the present action would be settled, and (c) the defendant would withdraw a federal action that he had filed in California; see *Halajian* v. *JPMorgan Chase Bank, N.A.*, United States District Court, Docket No. 2:23-cv-1522 (E.D. Cal.) (California action); which named as defendants, among others, (i) Hassett & George, P.C. (law firm), the law firm representing the plaintiff in the present action, and (ii) James Trudell, an attorney employed by the law firm, (2) after consulting with the plaintiff, the plaintiff's counsel notified the defendant's trial counsel that the plaintiff accepted the settlement offer and, additionally,

requested that the defendant refrain from serving process with respect to the California action, if process had not yet been served, (3) the plaintiff's counsel drafted and submitted proposed settlement documents to the defendant's trial counsel, who provided them to the defendant, and (4) the defendant's trial counsel subsequently informed the plaintiff's counsel that the defendant had " 'changed his mind' " and refused to honor the settlement agreement. (Emphasis omitted.) The plaintiff argued that its request that the California action not be served "was not a condition precedent to the [settlement] agreement, but rather an instruction to the defendant since there was now a settlement in place." The plaintiff maintained that "all the material terms of the settlement agreement [were] clearly and unambiguously present . . . ."

In his objection to the motion to enforce, the defendant represented that (1) on or about August 18, 2023, the defendant's trial counsel contacted the plaintiff's counsel to offer to settle the present action for $50,000, (2) the plaintiff's counsel responded that the plaintiff accepted the offer on the condition that the defendant agreed (a) not to serve process vis-à-vis the California action on the law firm or Attorney Trudell, or to terminate any pending service, and (b) to withdraw the California action as to the law firm and Attorney Trudell, (3) the defendant rejected the plaintiff's "verbal [condition] precedent," did not withdraw the California action, and subsequently served process on the law firm and Attorney Trudell in the California action, and (4) the plaintiff's counsel submitted proposed settlement documents to the defendant's trial counsel after the defendant had rejected the plaintiff's "verbal [condition] precedent . . . ." The defendant maintained that "[t]here was never a settlement agreement containing clear and unambiguous terms between the parties, and

additionally, [the plaintiff's] counsel made a counteroffer, which was indisputably rejected by [the defendant]."

In its reply memorandum, the plaintiff iterated that the parties reached a settlement agreement, the terms of which did not include a condition precedent. The plaintiff appended three exhibits to the reply memorandum, including (1) emails exchanged between counsel on August 18, 2023 (August 18, 2023 emails), and (2) a written, unsigned draft settlement agreement (draft agreement).[6]

The August 18, 2023 emails consisted of four emails. In the first email, sent by the plaintiff's counsel at 2:08 p.m., the plaintiff's counsel requested that the defendant's trial counsel "confirm our discussion earlier" and execute the attached draft agreement.

In the second email, sent by the plaintiff's counsel at 3:45 p.m., the plaintiff's counsel "memorialize[d] what transpired" earlier in the day, stating in relevant part that (1) the defendant's trial counsel contacted the plaintiff's counsel to offer to settle the present action and to "settle/withdraw/dismiss the [California action]" for $50,000, (2) the plaintiff's counsel conveyed to the defendant's trial counsel via telephone that the plaintiff accepted the settlement offer, whereby counsel "agreed that [they] had a settlement agreement as stated above and [the plaintiff's counsel] would draft up the agreement," (3) the plaintiff's counsel prepared and submitted the draft agreement to the defendant's trial counsel, and (4) when the plaintiff's counsel called the defendant's trial counsel later in the day to follow up, the

---

[6] The third exhibit was a copy of a decision in an unrelated federal action involving the defendant. See *United States* v. *Halajian*, Docket No. 1:14-cr-00208-SAB, 2015 WL 7292299 (E.D. Cal. November 19, 2015), aff'd, 671 Fed. Appx. 629 (9th Cir. 2016), cert. denied, 581 U.S. 919, 137 S. Ct. 1607, 197 L. Ed. 2d 709 (2017).

defendant's trial counsel "indicated . . . for the first time that [the defendant] had changed his mind and [had withdrawn] his settlement offer . . . after the settlement was agreed to and after all of the settlement documents were prepared." The plaintiff's counsel further stated that "there was no question that [counsel] had an agreement as of this morning as [the defendant's trial counsel] agreed . . . during [a] phone call this afternoon."

In the third email, sent by the defendant's trial counsel at 4:23 p.m., the defendant's trial counsel "memorialize[d] the entire substance of [the] settlement discussion," stating in relevant part that (1) the defendant's trial counsel was prepared to testify under oath that the plaintiff's counsel had conveyed that the plaintiff's acceptance of the defendant's settlement offer "was only conditional upon [the defendant] not serving [process on the] law firm or [Attorney] Trudell [in the California action],"[7] (2) the defendant did not terminate service of process on the law firm or Attorney Trudell, such that "there was never any performance of the condition precedent as required by [the defendant] for acceptance" and, therefore, there was no acceptance of the defendant's settlement offer, and (3) the defendant's trial counsel disputed that the "oral settlement offer" was enforceable.

In the fourth email, sent by the plaintiff's counsel at 4:34 p.m., the plaintiff's counsel stated in relevant part: "We ha[d] [a] deal as evidenced by your email . . . . The withdrawal of the actions was something to be performed as part of the settlement as noted in the [draft] agreement—you simply indicated that you would talk to [the defendant] about not having [the California action] served if it had not been done already. However,

---

[7] As we iterate later in this opinion, no testimony was offered during the *Audubon* hearing.

we had a deal which is why I did the [draft] agreement. We agreed on all the material terms. Moreover, [the plaintiff] was the party that 'accepted' the offer that you made when you call[ed] me to convey the [$50,000] offer. Acceptance was done on our end, when I called you to accept [the defendant's $50,000] offer today, not the other way around. You and I both know we had a deal and [the defendant] changed his mind after the fact as you admitted today . . . ." (Emphasis omitted.)

The draft agreement contained terms providing, inter alia, that (1) the defendant would pay the plaintiff $50,000 and (2) the parties agreed that the settlement agreement would "completely [resolve] any and all claims between the [p]arties that were asserted, or that could have been asserted, against any of the [p]arties named in the [present] [a]ction or relating to or arising out of the [parties' commercial] [c]ontract, as well as claims asserted [against] parties to the California [a]ction . . . . In addition, upon the execution of th[e] [settlement] agreement, [the defendant] shall within [three] business days withdraw or dismiss any and all lawsuits filed against the parties to th[e] [settlement] agreement as well as [certain nonparties] that [were] reportedly filed in California that relates to or arises out of the [parties' commercial] [c]ontract . . . ." The draft agreement made no mention of service of process with regard to the California action.

At the outset of the *Audubon* hearing, the court asked counsel whether they wanted to offer evidence or to have the court decide the motion to enforce "on the basis of what is in the record and the argument [at the hearing]." Counsel agreed to present argument on the motion to enforce and to rely on the record, including the August 18, 2023 emails and the draft agreement, without submitting evidence.

Additionally, during the *Audubon* hearing, the court asked counsel to specify what in the record the court

should consider in determining the terms of the settlement agreement. The plaintiff's counsel argued that the settlement agreement's terms were delineated in the draft agreement. The plaintiff's counsel further argued that, as the August 18, 2023 emails reflected, he emailed the draft agreement to the defendant's trial counsel, who, in his response email, did not dispute the terms set forth in the draft agreement but, rather, asserted that there was a condition precedent concerning the California action that had not been satisfied. The following colloquy then occurred between the court and the defendant's trial counsel:

"The Court: So [the defendant's trial counsel], I'm just going to flip it back to you. If you do agree that, okay, the settlement agreement is X, but judge, [the] plaintiff loses [its] argument because [the settlement agreement] wasn't complete, it didn't contain material terms, et cetera, et cetera.

"[The Defendant's Trial Counsel]: Yeah, I would go with the latter, Your Honor. . . . I'm not going to say that [the plaintiff's counsel is] wrong in that the amount of money is the same—I mean, I would argue that not every term in [the draft] agreement was discussed. I probably should have had that in my possession . . . at some point. So, I think that the argument would be there may be a discrepancy between the phone call [between counsel] and the [draft agreement]."

In its decision granting the motion to enforce, after referencing the motion, the defendant's objection, and the plaintiff's reply memorandum, the court stated that, "in arriving at its decision, [the court] consider[ed] carefully the full positions of the parties, including the arguments of the attorneys at the [*Audubon*] hearing . . . . At the [*Audubon*] hearing, counsel for the parties did not disagree on what the purported [settlement] agree-

ment consisted of, but only whether or not the [settlement] agreement (1) was clear and unambiguous, and (2) . . . contained a certain condition precedent [relating to the California action], which had not occurred. The terms of the [settlement] agreement were set forth in [the draft] agreement, which the defendant later unilaterally chose not to bind himself to. . . . The court has examined the [draft] agreement, and finds that its terms were clear [and] unambiguous, and [that it] contained all essential terms. Further, [the draft agreement] did not state or contemplate any condition precedent remaining to be satisfied." The court further stated that "it is important to note that counsel waived the presentation of sworn testimony at the [*Audubon*] hearing."

The defendant asserts that the court improperly determined that the parties reached an enforceable settlement agreement. The defendant maintains that the record, in particular the August 18, 2023 emails, demonstrated that a dispute existed between the parties as to the settlement terms, and, therefore, the parties did not reach a settlement agreement for the court to enforce summarily pursuant to *Audubon*. We are not persuaded.

Preliminarily, we iterate, as the court noted in its decision, that the parties waived their right to offer sworn testimony at the *Audubon* hearing. Thus, the only evidence in the record vis-à-vis the motion to enforce comprised (1) the August 18, 2023 emails and (2) the draft agreement. In his appellate brief, the defendant repeatedly relies on representations made by his trial counsel in his opposition to the motion to enforce; however, insofar as the defendant views these representations to be part of the evidentiary record, it is well settled that such representations are not evidence. See, e.g., *Norberg-Hurlburt* v. *Hurlburt*, 162 Conn. App. 661, 670, 133 A.3d 482 (2016) ("[t]his court, as well as our

Supreme Court, repeatedly has stated that representations of counsel are not evidence" (internal quotation marks omitted)).

On the basis of the record, we conclude that the court reasonably determined that there was no dispute that the parties reached a settlement agreement as delineated in the draft agreement. First, the August 18, 2023 emails support this determination.[8] The emails sent by the plaintiff's counsel reflected that the parties agreed to a settlement pursuant to the terms set forth in the draft agreement, which required the withdrawal of the California action but did not contain a condition precedent regarding service of process vis-à-vis the California action. The single email sent by the defendant's trial counsel reflected that the defendant did not raise concerns as to the terms contained in the draft agreement; instead, the defendant's sole issue revolved around the defendant's position that the parties had contemplated a condition precedent with respect to service of process in the California action, which was not satisfied. It is well settled that weighing conflicting evidence is within the exclusive province of the trial court. See *M. W.* v. *G. C.*, 232 Conn. App. 677, 683–84, 337 A.3d 758 (2025) ("The trial court, as trier of fact, determine[s] who and what to believe and the weight to be accorded the evidence. The sifting and weighing of evidence is peculiarly the function of the trier." (Internal quotation marks omitted.)); see also *Hudson City Savings Bank* v. *Hellman*, 234 Conn. App. 45, 66,     A.3d     (2025)

_____

[8] Although the court's decision does not mention the August 18, 2023 emails expressly, the decision references the plaintiff's reply memorandum to which the August 18, 2023 emails were appended. Additionally, during the *Audubon* hearing, (1) the court stated that it had reviewed the motion to enforce, the defendant's objection, and the reply memorandum, and (2) counsel relied on the August 18, 2023 emails during argument. Moreover, "we are entitled to presume that the trial court acted properly and considered all the evidence." (Internal quotation marks omitted.) *Diaz* v. *Manchester Memorial Hospital*, 161 Conn. App. 787, 795, 130 A.3d 868 (2015).

("[The court] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [finder of fact's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses." (Internal quotation marks omitted.)). Here, the court was free to accept the events regarding the formation of the settlement agreement as detailed in the emails from the plaintiff's counsel and to reject the defendant's conflicting version of those events in the email from his trial counsel, and we will not disturb on appeal the court's resolution of that conflict.

Second, the transcript of the *Audubon* hearing reflects an acknowledgement by the defendant's trial counsel that the parties entered into a settlement agreement as set forth in the draft agreement. During the *Audubon* hearing, the defendant's trial counsel did not challenge the statement by the plaintiff's counsel that the draft agreement reflected a settlement agreement reached by the parties; rather, when asked by the court regarding his position on the purported settlement agreement, the defendant's trial counsel responded that the draft agreement contained terms not discussed previously by counsel and that there was a "discrepancy" between the terms laid out in the draft agreement and the terms discussed by counsel via telephone. In other words, these statements reflect that the defendant's trial counsel did not dispute the existence of a settlement agreement but maintained that the draft agreement did not accurately reflect the terms of the settlement.[9] The court rejected this argument, determining that (1) the draft agreement "contained all essential terms," (2) the terms of the draft agreement were "clear [and] unambiguous," and (3) there was no condition

[9] During the *Audubon* hearing, the defendant's trial counsel made isolated statements that (1) "[the parties] clearly have a dispute as to what took place [during counsel's settlement discussions]" and (2) "[the defendant is] saying that the [settlement] agreement never happened [because] [t]here was never a meeting of the minds due to the condition that [the plaintiff's counsel] set forth." As we conclude, however, on the basis of the record,

precedent included in the terms of the draft agreement. With the exception of the court's determination that the draft agreement did not set forth a condition precedent, the defendant raises no cognizable claim on appeal challenging the court's analysis vis-à-vis the draft agreement, and, therefore, we need not discuss it further.[10]

the court reasonably determined that there was no dispute that the parties reached a settlement agreement.

[10] Although the defendant's appellate brief is not clear on this point, the defendant appears to assert that the court improperly determined that the draft agreement did not contain a condition precedent, citing provisions in the draft agreement requiring him to release his claims with respect to the California action. Insofar as the defendant properly has raised such an assertion, it is untenable because we construe the release of claims vis-à-vis the California action to be a duty to be performed pursuant to the settlement agreement, rather than a condition precedent. See *Electrical Contractors, Inc.* v. *50 Morgan Hospitality Group, LLC*, 211 Conn. App. 724, 735–36, 273 A.3d 726 (2022) ("It is well settled that [a] condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence." (Internal quotation marks omitted.)).

Insofar as the defendant has attempted to raise other claims challenging the court's determination that the draft agreement contained all essential terms and that the terms in the draft agreement were clear and unambiguous, he has not provided any substantive legal analysis, and, therefore, any such claims are abandoned as inadequately briefed. See *Randolph* v. *Mambrino*, 216 Conn. App. 126, 152, 284 A.3d 645 (2022) ("[A]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law . . . and [w]e repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Citation omitted; internal quotation marks omitted.)).

Finally, the defendant appears to claim that the court violated his right to a jury trial in resolving factual issues in connection with the motion to enforce. In short, this claim has no merit. See *Ackerman* v. *Sobol Family*

The judgment is affirmed.

In this opinion the other judges concurred.

*Partnership, LLP*, 298 Conn. 495, 535, 4 A.3d 288 (2010) (motion to enforce settlement agreement was "essentially equitable in nature" and, therefore, trial court was entitled to resolve factual dispute without jury); see also *Kinity* v. *US Bancorp*, 212 Conn. App. 791, 816–17, 277 A.3d 200 (2022) ("[i]n [*Ackerman*], our Supreme Court extended *Audubon* to permit the [trial] court to resolve issues of fact raised in connection with a motion to enforce a settlement agreement").